# Ohio Nisi Prius Reports

## NEW SERIES—VOLUME XXV.

Causes Argued and Determined in the Superior, Common 'Pleas, Probate and Municipal Courts of Ohio.

---

### VALIDITY OF THE OHIO CO-OPERATIVE MARKET STATUTES.

Common Pleas Court of Brown County.

BURLEY TOBACCO GROWER'S CO-OPERATIVE ASSOCIATION
v. CAREY GARDNER.

Decided, April, 1924.

*Constitutional Law—Co-operative Market Acts—Necessity for, if Agricultural Interests are to Successfully Contend with Giant Trusts—Classification to Farmers not a denial of equal Protection of the Laws of All Classes— Co-operative Organizations not Affected by the Sherman or Valentine Anti-Trust Laws—Burley Tobacco Association Enforces a Contract—Foreign Corporations not for Profit which have not procured Certificates in this State may do Business but are Denied the Right to Sue—Liquidated Damages and Provisions for Attorneys' Fees in Enforcing Contracts.*

1. The co-operative market association acts of Ohio are not in contravention of the equal protection of the laws provision of the Federal Constitution, or with the declaration of the state Constitution that government is instituted for the equal protection of the people.

2. Under the provisions of the Clayton amendment and the Volstead-Capper amendment, agricultural organizations are clearly excluded from the terms of the Sherman Anti-Trust act, and by

words and implication so much of the Valentine Anti-Trust act has been repealed as was in conflict with the co-operative market associations acts, leaving them free from operation of the anti-trust acts.

3. Inasmuch as the existence of the Burley Tobacco Growers' Co-operative Association is dependent upon the unwaivering allegiance of all its members and delivery of all tobacco grown by them, the facilities required in the way of large store houses, employment of many men, installation of steam and redrying systems and the borrowing of large amounts of money, and the difficulty of ascertaining the loss resulting from a breach of his contract by one of the members, the provision which is written into the contracts of all members for liquidated damages for failure to deliver tobacco in accordance with the terms of the said contracts, is based on a situation which amply justifies the fixing of liquidated damages.

4. The Ohio rule against recovery of attorney's fees in actions on contracts in the nature of a debt, is limited to debts in the narrow sense of the term, and is not applicable to contracts based on some form of paper in which the question of usuary does not arise and the contract specifically provides for such recovery.

5. Section 178, G. C., does not make void or even voidable, a contract entered into in this state by a foreign corporation not for profit which has failed to procure a certificate to do business in this state; said act only suspends the right of such a corporation to enforce such a contract in this state, until the provisions of the said statute have been complied with.

*Abe D. Waldauer*, Memphis, Tenn.; *Moulinier, Bettman & Hunt*, Cincinnati; *Nichols, Speidle & White*, Batavia; *Harry E. Parker*, Georgetown; for plaintiff.

*Harmon, Colston, Goldsmith & Hoadly*, Cincinnati; *Blair & Blair*, Portsmouth; *Young & Barnes*, Georgetown; *C. A. Linn*, Ripley, for defendants.

TARBELL, **J.**

This action is instituted by the Burley Tobacco Grower's Co-Operative Association, a non-profit corporation organized under the laws of the state of Kentucky, and authorized to and now doing business under the laws of the state of Ohio, against one of its grower-members to recover damages for the failure to deliver to the association the tobacco grown by him in the year 1922.

A general demurrer has been filed in each of the cases and by agreement of counsel, the demurrers in each and all of the cases are submitted on the briefs filed and oral arguments had in the instant case.

The petition alleges generally that the defendant, Carey Gardner, with many other growers of tobacco in the states of Kentucky, Tennessee, Indiana and Ohio, entered into a written contract with the plaintiff association in the year 1921, by the terms of which he agreed to deliver to the plaintiff, for the period of five years all tobacco grown on his land; that he failed to deliver said tobacco and that such failure constituted a breach of the contract, and, that by reason thereof the plaintiff association is entitled to recover damages, as provided by the terms of the contract, and, in the amount alleged in the petition.

Counsel for the defendant have urged in their briefs, and in the oral argument before the court, that the Co-Operative Marketing Act is unconstitutional and void, and the contract between plaintiff and defendant is invalid, for that defendant claims that the contract is:

First. In conflict with the Fourteenth Amendment of the Federal Constitution.

Second. In conflict with Article I, Section 2, of the Constitution of Ohio.

Third. That the contract is illegal by virtue of the terms of what is commonly known as the Sherman Anti-Trust Act.

Fourth. That the contract is in conflict with Section 6391 of the General Code of Ohio, passed April 19, 1898, Vol. 93, Pg. 193, of the Ohio Laws, known as the Valentine Anti-Trust Act.

Fifth. That the contract is void in that it provides for the payment of "Liquidated Damages."

Sixth. That the contract is illegal for the reason that it undertakes to impose upon the party who violates its provisions the burden of paying the fees of the attorney for the association in any suit instituted against such person for such violation; and,

Seventh. That the contract is illegal for the reason that

at the time the contract in question was entered into between the plaintiff and the defendant, the plaintiff association had no legal existence in Ohio, no legal authority to do business in Ohio, and could not institute an action in any county in the state of Ohio for a breach of such contract.

The court will endeavor to take up and briefly discuss each of these propositions in the order suggested.

The petition alleges, and the demurrer admits, that the plaintiff is a non-profit corporation, without capital stock; that its members are growers and producers of tobacco in the states of Kentucky, Tennessee, Indiana and Ohio, and that in the year 1921 such growers and producers of tobacco in said states, agreed among themselves and with said plaintiff association, to deliver to it all of the tobacco produced or grown by them for a period of five years.

That among the signers of this agreement was the defendant, Carey Gardner, who, notwithstanding his agreement to deliver his tobacco to the association, sold his 1922 crop of tobacco to a person other than the association, and the association proceeding under the terms provided for by the written contract brought this action against the defendant for liquidated damages in the sum of $400, and the further sum of $200 for expenses and attorney fees incurred by reason of the action.

The Fourteenth Amendment of the Federal Constitution, Section 1, contains among other provisions and things, the following:

"No state shall make or enforce any laws which shall deny to any person within its jurisdiction the equal protection of the laws."

It is contended by counsel for the defendant that the so-called Co-operative Marketing Acts in Ohio are in violation of the plain terms and meaning of this amendment.

While a large number of authorities are cited in support of such contention, reliance is principally had upon the case of *Connolly* v. *Union Sewer Pipe Company,* 184 U. S. Reports, 540-564.

Were it not for the later decisions of the Supreme Court of the United States, which either expressly over-rule or distinguish the Connolly case, where agricultural interests are involved, the court would be constrained to hold that the effect of this decision would be to nullify the Co-operative Acts in Ohio, or to render the contracts made thereunder illegal and void. However, there has been a constantly increasing tendency of the Supreme Court of the United States to depart from the apparent reasoning in the Connolly case and to distinguish it whenever possible, and to hold that the rule should be limited and not extended, if it has not, in fact, in later decisions overruled this case.

In the case of American Sugar Refining Co. v. Louisiana, 179 U. S. 89, there was involved the terms of a statute requiring the payment of a license tax by refiners of sugar and exempting planters and farmers grinding and refining their own sugar. This statute was attacked on the ground that it was in violation of the Fourteenth Amendment. In passing upon the question, the Supreme Court holds:

"The Constitution of Louisiana classifies the refiners of sugars, for the purpose of tax, into those who refine the products of their own plantations and those who engaged in the general refining business, and refine sugar purchased by themselves or put into their hands by others for that purpose, imposing a tax only upon the latter class.   *   *   *

The discrimination is obviously intended as an encouragement to agriculture and does not deny to persons and corporations engaged in the general refining business the equal protection of the laws."

Like classification of farmers has been upheld by the Supreme Court in the following cases: German Alliance Insurance Co. v. Lewis, 233 U. S., 389, 418; New York Central Railroad Co. v. White, 243 U. S., 188; Ward v. Krinsky, 42 Sup. Ct. Rep., 529.

In the recent case of Smith v. Kansas City Trust Co., 255 U. S., 180, where the constitutionality of the Federal Farm Loan Act was involved, the Supreme Court, in upholding the act, held that while it was clear that the benefits of the act

were limited to the farmers alone, yet that such classification did' not render the act illegal.

The last case before the Supreme Court, where this question was presented, was that of *National Union Fire Insurance Co.* v. *Wanberg,* reported in No. 62, Advance Opinions, 1922.

In the opinion by Chief Justice Taft, the court says:

"The statute treats the business of hail insurance as effected with the public interest. In that country where a farmer's whole crop, the work and product of a year, may be wiped out in a few minutes, and where the recurrence of such manifestations of nature is not infrequent, and no court can provide against their destructive character, it is of much public moment that agencies like insurance companies to distribute the loss over the entire community should be regulated so as to be effective for that purpose. * * * There is no discrimination and no denial of the equal protection of the laws."

The purpose of the Co-operative Marketing Act is to provide a way and means for the farmers, the producers, to work out their own salvation without impairing the rights of other persons. If the Supreme Court of the United States will uphold a state statute, which has for its object the indemnifying of a single farmer against a loss caused by nature, for a much stronger reason it would uphold an act which has for its purpose the protection of every farmer against certain ruin that would follow unsound economic conditions.

A review of the cases cited by counsel for the plaintiff clearly indicates that since the decision in the Connolly case there has been a sure and actual inclination upon the part of the courts of last resort in every state where such acts have been before such courts, and, in the Supreme Court of the United States, to uphold such co-operative acts. This leaning of the courts is not without good and substantial reason therefor.

The public good and the public prosperity depends, in a large measure, upon the success of agriculture in this country. More than 58 per cent. of the entire wealth of the United States is invested in real estate, and more than 50 per cent. of her population is· engaged directly or indirectly in agricultural

pursuits. The majority of people still live in the rural districts, and this majority are the producers of the food supplies of the country.

This history of the tobacco industry in the White Burley section of the United States illustrates clearly the reason why there is a tendency throughout the nation and the several states thereof to uphold any act which excludes from the Sherman Anti-Trust Act, and any similar act, the various projects of agriculture.

The petition avers, and the demurrer admits, that "For a long time prior thereto (the organization of plaintiff association) the tobacco raised by said growers was often subjected to speculative manipulation and said growers were unable to realize the cost of production and of marketing their said tobacco, and the business of producing and marketing tobacco had become extremely hazardous." Every grower and user of tobacco is aware of the fact that for a great many years the manufactured product has been sold at a fixed, standard price, and at just as high a price as could be safely commanded. Likewise, it is well known that before the incorporation of the plaintiff association the price of the unmanufactured tobacco varied all the way from 2 cents and 3 cents per pound to approximately 40 cents and 50 cents; that some years the average price was approximately 7 cents and 8 cents and in other years 20 cents to 25 cents; that only two or three years ago the growers in this section of the White Burley tobacco belt received but about 10 cents a pound for their tobacco; yet, during all of this time the tobacco trust and its subsidiary companies never varied from the high price theretofore fixed for the manufactured product. What has been true of the tobacco industry has been likewise true of the cotton, milk, fruit and other agricultural industries in the country. In other words, by this reasoning and this illustration the court is intending to convey the idea that there has been a laudable reason why the courts of last resort, in all the states, have endeavored to uphold the so called Co-operative Marketing acts and the contracts made thereunder.

As to the second proposition. The court has carefully con-- sidered the authorities submitted, and is clearly of the opinion that the Co-operative Marketing Act in Ohio is not in conflict with Article I, Section 2, of the Constitution of Ohio, which provides in part that, "Government is instituted for their (the people's) equal protection and benefit."

In one or more of the cases cited by counsel for the defendant *Williams* v. *Donough,* 65 Ohio State, 499-506; *Harmon* v. *State,* 66 Ohio State, 249 to 254, and *State* v. *Cleveland, Ry. Co.,* 70 Ohio State, 506; it will be observed that there is discrimination between certain persons, or groups of persons, of a single class, but no analogous classification is made by the Ohio Co-operative Act in question, for the reason that this act applies to all agreements for the co-operative marketing of all agricultural products, when made by the growers of such products and when made in the manner provided for by the terms of the act.

A careful consideration of the Ohio authorities cited by counsel for plaintiff and defendant leads the court to conclude that the act is constitutional.

Now, as to the third contention—the claim that the Co-operative Marketing Act is in conflict with the Sherman Anti-Trust Act. Assuming that the products of the association become a subject of Interstate Commerce, by the terms of the Clayton amendment, and the later provision of the Volstead-Capper amendment, agricultural organizations of the kind here in question are clearly excluded from the terms of the Sherman Act. This conclusion has already been reached by the Supreme Courts of North Carolina and Kentucky and several other states, and this court concurs in the findings there made.

As to the fourth contention—nor does the court find that the Co-operative Act in Ohio is in conflict with provisions of Section 6391 of the Ohio act known as the Valentine Anti-Trust Act, passed April 19, 1898.

The original Co-operative Act of February 20, 1920, 108 Ohio Laws, page 1246, and the subsequent act of March 21,

1921, 109 Ohio Laws, page 250, by their terms either directly or by implication repeal so much of the Valentine act as appears to be in conflict therewith. The Co-operative Act in Ohio, passed March 28, 1923, found in Vol. 110, page 91, if not by so many words, then clearly by implication operates likewise. The Court, believing that the act is not in conflict with either the Federal or State Constitution, finds that it is not illegal or non-inforcible by virtue of any provision of the Valentine act.

Fifth, it is claimed that the contract in question is void in that it provides for the payment of "Liquidated Damages" in the event of a breach thereof. In the case of *Potter* v. *Dark Tobacco Grower's Co-operative Association*, decided by the Court of Appeals of Kentucky on the 21st day of December, 1923, opinion by Judge Clark, the court says:

"Appellee has no capital stock, is not operated for profit, and is not permitted to buy, handle or sell tobacco except for its members, but is dependent for its existence, and an opportunity to serve its members, upon their observance of their contracts. It would be utterly impossible to ascertain the damage that would result to the co-operative effort from a breach of their like contracts by one or more members and it was both wise and provident, if not essential for attainment of their purposes and that they agree on a basis for estimating same, and the legislature in recognition of that fact expressly authorized them to do so, although that right clearly existed without such express authority. Nor do we regard, and certainly we can not say in the absence of proof, that five cents a pound is unjust or oppressive, or out of all proportion to the damages which would result from such a breach. Hence the sum so fixed must be construed as liquidated damages, rather than a penalty, and is collectable."

In the case of *Doan* v. *Rogan*, 79 Ohio State, p. 372, the Supreme Court of Ohio lays down the following rule relative to the collection of liquidated damages:

"Whether a stipulation providing for liquidated damages for the breach of a contract is to be construed as liquidated damages or as a penalty depends upon the intention of the parties to be gathered from the entire instrument. While courts will not construe contracts in a way authorizing recov-

ery for liquidated damages simply because the parties have used that term in the agreement, yet where parties to a contract otherwise valid have in terms provided that the damages of the injured party by a breach on the part of the other of some **particular** stipulation, or for a total breach, shall be a certain sum specified as liquidated damages, and it is apparent that damages from such breach would be uncertain as to amount and difficult of proof, and the contract taken as a whole is not so manifestly unreasonable and disproportionate as to justify the conclusion that it does not truly express the intention of the parties, but is consistent with the conclusion that it was their intention that damages in the amount stated should follow such breach, courts should give effect to the will of the parties as so expressed and enforce that part of the agreement the same as any other.''

Again in the case of *Knox Rock Blasting Co.* v. *Grafton Stone Co.*, 64 Ohio State, p. 361, our Supreme Court quotes with approval from the case of *Dwinel* v. *Brown*, 54 Me., 468, as follows:

''The parties themselves best know what their expectations are in regard to the advantages of their undertaking and the damages attendant on its failure, and when they have mutually agreed on the amount of such damages in good faith and without illegality, it is as much the duty of the court to enforce that agreement as it is the other provisions of the contract.''

Of like tenor, is the holding in *Sun P. P. Assn.* v. *Moore*, 183 U. S., 642; *Bagley* v. *Peddie*, 16 New York, p. 469.

The court is of the opinion that the principle announced by our Supreme Court in the case of *Doan* v. *Rogan* applies to the contract in question, for by the terms of the contract the parties thereto have provided that the damages of the injured party, caused by a breach on the part of the other, shall be a fixed sum, specified as liquidated damages, namely, five cents per pound for each pound of tobacco not delivered, and the costs of the action, including reasonable attorney fees, and it would seem to be clear that damages from such a breach would, owing to the peculiar nature of the contract, be uncertain as to the amount and difficult to otherwise prove. The

very existence of the plaintiff association necessarily depends upon the full co-operation of all its members and the delivery to it of all the tobacco grown by them. The marketing of such tobacco requires large store houses, the employment of many men, the installation of steaming and re-drying systems, the borrowing of large sums of money, all of which is necessarily done and procured on the strength of the members delivering to the association all of the tobacco of each and every member who has contracted to deliver the same to plaintiff association. The contract in question presents just such a situation as our Supreme Court says would justify the upholding of a provision in a contract for the payment of liquidated damages.

Now, as to the sixth contention, That the contract is illegal for the reason that provision is made in it for the payment of attorney fees and other expenses. This - precise question, so far as the court is able to discover, has not been passed on directly by the Supreme Court of this state. The Supreme Court in the case of *Miller* v. *Kyle,* 85 Ohio State, 186, lays down the rule, "That stipulations incorporated in promissory notes for the payment of attorney fees, if the principal and interest be not paid at maturity, are contrary to public policy and void" and cites approvingly *State ex rel Commissioners* v. *Taylor,* 10 Ohio 378; *Shelton* v. *Gill,* 11 Ohio, 417 and *Levens* v. *Bang,* 50 Ohio State, 591, and follows these citations with this statement:. "In all of these cases the contracts were denounced as contrary to public policy. The conclusion is well sustained by the obvious tendency of such contracts to encourage suits."

However, a careful reading of these cases discloses that the rule against the recovery of attorney fees is limited to contracts involving the lending and borrowing of money; in other words, contracts in the nature of a debt, in the narrow sense of the term. The court is unable to find any authority in Ohio holding that attorney fees and expenses may not be recovered, where the contract specifically provides for such recovery, in that class of contracts which do not exist in the form of a debt, evidenced by some form of negotiable paper and where

the question of usury is not present. The court is of the opinion that such a contract is governed by the same rules that apply to liquidated damages, and by the common law relating to contracts by which it is permissible to recover attorney fees as special damages incidental to the breach of an agreement which provides for the recovery of such special damages. As has heretofore been said by the court in this opinion, the plaintiff association is made up altogether of growers and producers of tobacco, and on them the life of the organization depends, not alone upon their co-operation, but also upon their faithful performance of each and every term of the contract entered into. The association is a corporation not for profit; it is mutual in its terms, each member relying upon and depending upon the honest co-operation of every other member. Since the corporation can make no profit, and therefore has no funds available to pay the expenses of litigation, unless the observant members thereof are charged or taxed, it seems to the court that it is only fair, reasonable and just that a member who breaches his contract and thereby makes litigation necessary should pay the reasonable fees and expenses of such litigation.

Now, as to the seventh and last proposition urged by counsel for the defendant, namely, that the contract is illegal for the reason that at the time the contract in question was entered into between the plaintiff and defendant, the plaintiff association had no legal existence in Ohio, no legal authority to do business in Ohio, and could not institute an action for breach of the contract in this state, the court is of the opinion that this objection to the validity of the contract is not well grounded.

The plaintiff association is not a corporation organized for profit, it has no capital stock, and is a mutual organization in all of its essential details. It is a foreign corporation organized under the laws of the state of Kentucky. While it is true that prior to the month of September, 1923, the plaintiff had not filed in the office of the Secretary of State of Ohio a certified copy of its articles of incorporation in order to receive a certificate of qualification, such application for a cer-

tificate was unnessary in order to enable the plaintiff association to do business in Ohio. Section 178 of the General Code of Ohio, provides as follows:

"Before a foreign corporation *for profit* transacts business in this state, it shall procure from the Secretary of State a certificate that it has complied with the requirements of law to authorize it to do business in this state, and that the business of such corporation to be transacted in this state is such as may be lawfully carried on by a corporation organized under the laws of this state for such or similar business, or if more than one kind of business by two or more corporations so incorporated for such kinds of business exclusively. *No such foreign* corporation doing business in this state without such certificate *shall maintain an action in this state* upon a contract made by it in this state until it has procured such certificate. This section shall not apply to foreign banking, insurance, building, and loan, or bond and investment corporations."

Under the terms of this section, corporations not organized for profit are not required to file an application and secure a certificate of the Secretary of State, preliminary to *doing business in this state.* However, such a corporation must file an application and procure such certificate *before instituting an action* in the courts of this state on any contract made by it with a citizen of Ohio; and the plaintiff association did file such application and did receive such certificate before this action was instituted. The objection urged is one that goes to the remedy or the right to institute an action rather than to the validity of the contracts made and entered into by and between the parties. In this connection attention is called to the very able and well considered opinion of Judge Pugh in the case of *Fergus* v. *City of Columbus,* reported in 6. N. P. (O.S.), page 82; Ohio Decisions, Vol. VIII, p. 290, in which he holds that a statute similar to the one in question, Section 178, General Code—"do not make the contract of foreign corporations, made before the statute is obeyed, void or even voidable; they only suspend the right of the corporation to enforce the contract by any remedy, until the statute's provisions are complied with."

Again, is not the defendant estopped to deny or to question the capacity of the plaintiff association to contract with him and to institute this action. The plaintiff is a non-profit corporation and its membership consists of a large number of producers and growers of tobacco. The defendant, as one of such members, induced the plaintiff on the strength of his membership and his promise to deliver his tobacco to plaintiff, to make large expenditures of money and to take other steps in good faith, to receive, handle, care for and sell the tobacco of its members. He has received benefits both directly and indirectly from his joining said association. In the case of *Newburg Petroleum Co.* v. *Ware,* 27 O. S., p. 343, the syllabus is as follows:

1. It is not contrary to the laws of Ohio, nor against public policy, in the present condition of her laws, for a foreign corporation, lawfully organized in a sister state, to do business in Ohio.

2. A foreign corporation, authorized by the laws of the state in which it was organized to do business in this state, may transact business in Ohio not inconsistent with Ohio laws; may sue and be sued in our courts.

3. Persons entering into contracts with such foreign corporation concerning property, or rights in property appropriate to its business in Ohio, will be estopped after dealing with said corporation, recognizing by their acts its validity and receiving the benefits of the contract, from denying the power of the corporation to make the contract, in an action on the contract.''

Judge Ashburn, in delivering the opinion of the court, on page 354, restates the rule as follows:

''As a general rule, a party will be concluded from denying his own action or admissions which are designed to and do influence the conduct of another and when such denial will operate to the actual injury of that other person.

The defense in this case appears to have in it no equitable consideration, and the laws will not sanction an inequitable proceeding where the integrity of the law can be maintained by a different course. Good faith requires that a person, who has recognized the existence of a corporation by dealing with it openly, with full knowledge of its business character, is yet in the enjoyment of the fruits of the transaction with it under

the contract, should be estopped from denying, in this collateral way, the power of the corporation to enter into the contract. When parties seem unwillingly to comply with contracts, lawful in their character, courts consider it a duty to admonish them, that it is not fraudulent nor contrary to public policy for them to do so.''

If the producers of farm products are to be protected against gigantic combinations of capital and assured a decent wage for their toil, co-operative marketing associations are necessary. Before the organization and incorporation of plaintiff association, the farmers were compelled to take what the buyer— the trust—offered and was willing to give for his tobacco— not what it was worth. His labor, in many instances, netted him less than $1.00 a day. He stood face to face with financial ruin. To meet this condition of affairs and to enable the farmers to combine their resources in order that they might command and receive a fair price for their tobacco, the plaintiff association was organized and incorporated. These are matters of general knowledge and public interest of which courts take judicial notice.

The court is clearly of the opinion that the contract in question is a valid and binding obligation, and that the objections made to it are not well grounded. The demurrer is overruled. Exceptions of the defendant may be noted.